UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BELLESA ENTERPRISES INC., a Canadian corporation,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>LH TOPCO S.À.R.L., a Luxembourg company, WOW TECH GROUP GMBH, a German company, WOW Tech USA Ltd., a Delaware corporation, LOVEHONEY Ltd., a U.K. company, LOVEHONEY, LLC, a Georgia limited liability company, and LOVEHONEY GROUP RETAIL, LLC, a Texas limited liability company,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:26-cv-5857 (　) (　)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DAMAGES

Plaintiff, Bellesa Enterprises Inc. ("Bellesa"), by and through its undersigned counsel, for its Complaint for Damages against Defendants LH TOPCO S.À.R.L. ("LH TOPCO"), WOW TECH GROUP GMBH, WOW Tech USA Ltd., LOVEHONEY Ltd., LOVEHONEY, LLC, and LOVEHONEY GROUP RETAIL, LLC (collectively, "the Lovehoney Group" or "LHG"), alleges and states:

## Introduction

1.    This case arises from Defendants' access to Bellesa's confidential information during acquisition discussions governed by two NDAs, and Defendants' subsequent use of that information to develop competing marketing campaigns.

1

2.      Bellesa is a Quebec-based consumer brand in the sexual wellness industry. It built its business through original creative work, rigorous A/B testing, and a proprietary marketing system that includes influencer-led content, personalized landing pages, email-capture mechanisms, follow-up email sequences, gamified engagement features, and community-driven content formats. Bellesa developed this system through substantial time, testing, and investment. Its value resides not only in the public-facing content, but also in the nonpublic performance data, testing results, and internal know-how that reveal what worked, what did not, and why.

3.      Defendants operate competing brands in the sexual wellness market, including Womanizer, We-Vibe, and Lovehoney. LH TOPCO and the Lovehoney Group used their global operating structure and distribution channels to deploy campaigns and marketing materials derived from Bellesa's confidential information on a scale that materially affected Bellesa's competitive position.

4.      In mid-2022, LH TOPCO approached Bellesa regarding a potential acquisition or other negotiated transaction. To facilitate those discussions, Bellesa and LH TOPCO entered into a written confidentiality agreement dated June 21, 2022 (the "2022 NDA"). In January 2024, the parties entered into a second confidentiality agreement dated January 4, 2024 (the "2024 NDA"). *See Exhibits 1 and 2 attached hereto and incorporated herein by reference* (collectively, the "NDAs"). Both NDAs define "Evaluation Material" broadly and impose clear restrictions, including the following:

2

(a)    LH TOPCO could use Bellesa's Evaluation Material only to evaluate the proposed transaction, and not to compete with Bellesa, copy Bellesa's materials, or solicit or conduct business with Bellesa's customers or suppliers by using Bellesa's information;

(b)    the NDAs required the return or destruction of Evaluation Material upon request; and

(c)    both NDAs state that unauthorized use or disclosure may cause irreparable harm warranting injunctive relief.

5.    During those NDA-governed discussions, Bellesa disclosed Evaluation Material containing confidential information comprising its most sensitive competitive intelligence, including confidential marketing strategies and scripts, the structure of its influencer-driven acquisition funnel, internal performance data showing which digital marketing campaigns succeeded and at what return on spend, the design and methodology of its gamified engagement features, and internal playbooks for community-driven content formats that generated organic reach.

6.    After obtaining access to Bellesa's confidential information, LH TOPCO made an acquisition offer materially below valuations that other prospective acquirers had attributed to Bellesa and discounted that offer based in part on patent-infringement allegations that Bellesa had disputed and that the Defendants had not pursued in litigation.

7.    After the acquisition discussions ended, LH TOPCO, through WOW and the Lovehoney Group, began running digital marketing campaigns that closely tracked key elements of Bellesa's campaigns and broader marketing

3

architecture. The copying was systematic and extended across multiple components of its marketing system.

8.    By placing materially similar campaign concepts, funnel structures, and messaging into the market, Defendants:

(a)    Reduced the effectiveness of Bellesa's own campaigns: When the same influencer content format, landing page design, and email sequence are offered by  a competing brand, each subsequent exposure delivers diminishing returns.

(b)    Increased Bellesa's influencer acquisition costs: As the Defendants entered the same influencer market with the same funnel structure, the cost of securing influencer partnerships in Bellesa's niche rose substantially.

(c)    Diverted warmed-up customers: Consumers previously exposed to Bellesa's advertising were captured by the Defendants' near-identical campaigns.

(d)    Suppressed Bellesa's marketing ROI and margins: The combined effect of campaign saturation, increased costs, and customer diversion caused a measurable decline in Bellesa's return on marketing spend.

(e)    Reduced  enterprise value: The foregoing factors reduced Bellesa's growth trajectory, margin profile, and enterprise valuation.

9.    The Defendants used the disclosed information across multiple channels and affiliated entities in ways that harmed Bellesa's competitive position.

10.     Bellesa seeks to stop the ongoing misconduct, recover damages and obtain other appropriate relief for the misappropriation and infringement, and obtain compensation for the market harm, increased costs, and loss of value suffered.

11.     Modern digital advertisers can measure, with granularity, the viewership and engagement attributable to specific advertisements and features. These metrics have economic value because they allow the operator to determine which marketing programs create the highest revenues and which do not.

12.     Bellesa competes with the Defendant Lovehoney entities, all of which LH TOPCO owns and controls, in the sexual wellness industry. The Defendant Lovehoney entities have been major players in the industry for years. Bellesa is a relative newcomer. Bellesa's revenue grew over $25 million in three years, and its market share increased over that same period.

13.     Bellesa employs proprietary intellectual property to maximize the net expected value across its operations. For example, Bellesa's Influencer Marketing leverages a proprietary machine learning program called the Influencer Intelligence System ("IIS"). IIS uses artificial intelligence ("AI") to predict the performance of marketing campaigns based on thousands of prior campaigns by assessing multiple data-driven factors. Bellesa uses data analytics to refine its website and digital marketing content and to avoid spending resources on underperforming content.

14.     In 2022, Bellesa shared its Evaluation Material with LH TOPCO through a virtual data room ("VDR"). The VDR was hosted in New York, and LH

TOPCO accessed Bellesa's confidential information through the VDR in New York.

15.    Bellesa's digital marketing data and analytics comprise economically valuable assets that Bellesa maintains in strict confidence. A rival with access to Bellesa's data and analytics could bypass years of its own trial-and-error process and, instead of incurring the expense and risk of independently testing new content and features, rely on Bellesa's confidential data showing which content and features delivered superior financial results.

16.    LH TOPCO shared Bellesa's Evaluation Materials, or analyses derived from them, with LHG personnel responsible for marketing, ecommerce, CRM, influencer programs, and brand campaigns. That inference is supported by the timing of the campaign replications following VDR access, the replication of high-investment campaign structures whose economic value was not publicly knowable, and the coordinated deployment of Bellesa-derived campaigns across multiple LHG-controlled brands, including Lovehoney, Womanizer, and We-Vibe.

17.    The Defendants used Bellesa's confidential performance data and marketing plans to identify which of Bellesa's campaigns and materials had succeeded, and then reproduced those materials, in certain instances down to identical typographical errors, in direct competition with Bellesa. As set forth in detail below, that conduct violated the NDAs, the federal Copyright Act, and federal and state trade secret laws.

18.    The table below provides a summary of the actionable events.

| DATE | EVENTS |
|---|---|
| June 2022 | LH TOPCO approached Bellesa regarding a potential acquisition. Bellesa and LH TOPCO executed a confidentiality agreement making  Bellesa's trade secret data  available on a |

| DATE | EVENTS |
|---|---|
| | strictly confidential basis for the limited purpose of evaluating the proposed transaction. |
| July 2022 | Bellesa uploaded confidential diligence materials (the "Evaluation Materials") to a VDR based in New York and provided access to LH TOPCO.[1] |
| July–August 2022 | LH TOPCO reviewed Bellesa's Evaluation Materials in the VDR. |
| August 2022 | LH TOPCO issued a letter of intent to Bellesa materially below subsequent market indications.. |
| October 2022 | Discussions end. |
| 2023 | LH TOPCO, through LHG, launched digital marketing campaigns using the structure, sequencing, and creative features of Bellesa's work in ways that closely tracked Bellesa's Evaluation Materials. Bellesa did not discover the pattern of copying until late 2023 or early 2024. |
| April 2024 | Bellesa and LH TOPCO entered into a renewed confidentiality agreement to discuss another possible transaction. |
| April - December 2024 | The LHG launched a more concentrated wave of digital marketing campaigns based on Bellesa's Evaluation Materials. |
| 2025-2026 | LHG's use of digital marketing strategies based on Bellesa's Evaluation Materials became rampant. |

19.     The Defendants' misconduct includes breach of the two NDAs, infringement of Bellesa's Canadian-copyrighted works, trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") and New York state law, and unfair competition.

20.     The Defendants' actions have caused severe and ongoing harm to Bellesa, including lost profits, increased costs, dilution of competitive advantage, and destruction of enterprise value.

---

[1] In this Complaint, Bellesa uses the term "Evaluation Materials" to encompass the confidential diligence materials disclosed to LH TOPCO as defined in the two Confidentiality Agreements discussed in paragraphs 35-42 below.

7

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because the action arises under the laws of the United States, including the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. § 1836.

22.     This Court has supplemental jurisdiction over Bellesa's state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391. The Defendants transacted business in this District, directed infringing and tortious conduct into this District, and caused harm to Bellesa from improper acts performed in this District. Bellesa's executives negotiated two Confidentiality Agreements with LH TOPCO while in New York, thereby forming those contracts in New York and directing and performing certain contractual obligations in this state.

## PARTIES

24.     Bellesa Enterprises Inc. is a Quebec-based consumer brand operating in the sexual wellness industry, with customers, marketing operations, and commercial relationships throughout the United States, including New York. Bellesa's primary offices are at 3800 Rue Saint-Patrick, Suite 100-LE, Montreal, Quebec H4E 1A2, Canada. Bellesa sells goods and services throughout the United States.

25.     Defendant LH TOPCO S.À.R.L. is registered in Luxembourg and has its primary place of business at 53, Boulevard Royal, L-2449, Luxembourg.

8

LH TOPCO owns and controls the LHG, including several U.S.-based subsidiaries described below. LH TOPCO negotiated with Bellesa's executives in New York, and at least one of the Agreements was executed by Bellesa in New York.

26.    Bellesa used New York-based advisers for the contemplated transaction with LH TOPCO.

27.    Defendant WOW Tech Group GmbH ("WOW TECH") is a sexual wellness company, wholly owned and controlled by LH TOPCO, incorporated in Germany with offices at Hermann-Blankenstein-Straße 5, 10249 Berlin, Germany.

28.    WOW TECH owns a United States subsidiary, WOW Tech USA Ltd ("WOW USA"). WOW USA is a Delaware corporation having a primary business address at 103 Foulk Road, Suite 202, Wilmington, DE 19803-3741. WOW TECH owns and controls WOW USA under the LH TOPCO corporate umbrella.

29.    Defendant Lovehoney Ltd. ("LH UK") is a U.K. entity doing business at 100 Locksbrook Road, Bath, BA1 3EN.

30.    Defendant Lovehoney, LLC ("LH USA") is a Georgia limited liability company doing business at 5156 Southridge Parkway, Suite 110, College Park, GA 30349. LH UK owns and controls LH USA.

31.    Lovehoney Group Retail, LLC ("LGR") is a Texas limited liability company doing business at 5156 Southridge Parkway, Suite 110, College Park, GA 30349. According to the Georgia Secretary of State records, LH USA and LGR have the same corporate control number.

32. WOW TECH, WOW USA, LH UK, LH USA, and LGR (i.e., the LHG) have all directed business activities at residents of New York, including, without limitation, directing digital marketing at New York consumers derived from Bellesa's Evaluation Materials obtained by LH TOPCO through the New York-based VDR.

33. LH TOPCO signed two "Confidentiality Agreements" with Bellesa, one in 2022 and one in 2024. The NDAs contain substantially identical terms. Bellesa's CEO negotiated and signed the NDAs while he resided in New York, thereby forming the contracts in New York.

34. LH TOPCO owns and controls the LHG entities that market and sell sexual wellness products throughout the United States, including New York. LH TOPCO and the LHG entities constitute a single, vertically integrated global corporate entity.

## FACTUAL ALLEGATIONS

### Bellesa's Proprietary Marketing Engine

35. Bellesa competes in the sexual wellness industry through its public-facing websites and social media accounts. The Evaluation Materials drive Bellesa's commercial success, along with its original, creative, rigorous A/B testing and a repeatable, proprietary "engine" of marketing campaigns. A/B testing, also known as split testing, is a scientific method used to compare two versions of a webpage, email, advertisement, or app feature to determine which one performs better.

36. At substantial expense, through years of experimentation, research, development, and trial and error, Bellesa developed a proprietary, integrated

marketing system. Bellesa maintains in confidence its specific test setups, internal processes for running and evaluating A/B tests, and the results of that testing. Bellesa developed customized test frameworks and proprietary statistical models that are not generally known or readily ascertainable through proper means, such as reviewing public-facing digital content. That information provides Bellesa with competitive advantages.

37.　The economic value of Bellesa's digital marketing derives from confidential internal know-how, sequencing, metrics, and optimization data contained in the Evaluation Materials that the public cannot access.

38.　Bellesa protects the confidentiality of its Evaluation Materials by restricting internal access, using password-protected computer storage, and using non-disclosure agreements.

### The NDAs and LHG's Breaches

39.　In 2022, LH TOPCO approached Bellesa to explore a potential acquisition or other negotiated transaction. Before moving forward with those discussions, Bellesa required LH TOPCO to execute the NDA attached hereto as Exhibits 1 and 2.

40.　The NDAs limited use of the Evaluation Materials, prohibited competitive use, required return or destruction of materials, and acknowledged that unauthorized use would cause irreparable harm.

41.　Both NDAs define confidential information as:

**3. Evaluation Material.** As used herein, "Evaluation Material" includes all data, reports, analyses, compilations, studies, interpretations, appraisals, evaluations, financial information, forecasts, budgets, strategic plans, contracts, operations, technical information, computer software, prototypes, processes, prospects, legal opinions or other

11

records, correspondence with regulators, Personal Information (as hereinafter defined), records and other materials, in whatever form communicated or maintained, whether documentary, computer storage, posted on a data room, oral or otherwise, and all copies thereof, that (i) contain or otherwise reflect information concerning the Company (and any predecessor entities), its affiliates or any of its business, operations, assets, liabilities, plans, prospects, properties or affairs, or the Transaction, or any portion thereof, that the Company or its Representatives may provide to you in connection with the Transaction on or after the date of this Agreement or (ii) are prepared by you or your Representatives and contain or otherwise reflect or are based upon, in whole or in part, the Evaluation Material referred to in Subsection 3(i); regardless of whether or not such information is identified as "confidential".

42.    The NDAs prohibited LH TOPCO from using or disclosing the

Evaluation Material:

4. **No Disclosure of Evaluation Material.** In consideration of you being furnished with the Evaluation Material and as a condition to its receipt, **the Evaluation Material shall be kept confidential and shall not, without the Company's prior written consent (which may be arbitrarily withheld), be disclosed by you or your Representatives in any manner whatsoever, in whole or in part, other than to your Representatives. Moreover, you agree to reveal Evaluation Material only to your Representatives** if and to the extent that such Representatives, in your reasonable judgement, need to know such Evaluation Material for the purpose of evaluating the Transaction, are informed by you of the confidential nature of the Evaluation Material and have agreed to act in accordance with the terms and conditions of this Agreement. **You will comply with appropriate security measures to protect the Evaluation Material with the same degree of care you use to keep your own similar information confidential, but in no event will you use less than a reasonable degree of care in order to preserve and protect the secrecy of, and to avoid the disclosure or use of, the Evaluation Material, and you will as soon as reasonably practicable advise the Company in writing (email being sufficient) of any misappropriation or misuse by any person of the Evaluation Material that may come to your attention.** You shall direct each of your Representatives to observe the terms of this Agreement and shall be responsible for any breach of this Agreement by your Representatives (including your Representatives who, subsequent to the first date of their receipt of the Evaluation Material hereunder, cease to be your Representatives).

6. **Restricted Use. You shall not, and you shall direct your Representatives not to, (i) use the Evaluation Material for any purpose other than evaluating the Transaction,** (ii) for a period of 18 months

from the date of this Agreement, use the Evaluation Material to deal with or solicit the business of any person who is or was a client or customer of the Company, (iii) for a period of 18 months from the date of this Agreement, use the Evaluation Material to deal with or solicit the business of any person who is or was a supplier or distributor of the Company. For the avoidance of doubt, the parties acknowledge and agree that dealing with or soliciting the business of any person in the course of their ordinary course of business or conducting any commercial, market or similar diligence process in connection with the Transaction shall not constitute a breach of this clause, provided that the same is undertaken without use of the Evaluation Material.

**11. Proprietary Rights.** You hereby acknowledge and agree that title to and ownership of the Evaluation Material shall remain with the Company.

**15. Term.** This Agreement shall terminate on the earlier of the entering into of a definitive written agreement in relation to the Transaction and the date that is two (2) years from the date hereof. **Notwithstanding such expiry of the term, you shall not be relieved of any liability for any breach by you or your Representatives of this Agreement** and the obligations relating to Personal Information will continue in accordance with applicable privacy legislation.

*Exs. 1 & 2 (Emphasis added).*

43.     The NDAs are governed by the laws of the Province of Quebec and the laws of Canada. *Exs. 1 & 2, ¶ 16.* The NDAs permit, but do not require, legal proceedings to be filed in Quebec. *Id.* The NDAs do not divest this Court of jurisdiction or venue.

### Defendants' Acquisition and Use of the Evaluation Material

44.     Bellesa relied on LH TOPCO's representations of genuine acquisition interest and disclosed its most closely guarded competitive trade secrets, including without limitation, its Evaluation Materials containing statistical analyses comprising detailed, data-driven analyses of what particular features, textual materials, pictorial materials, advertisements, posts (written by Bellesa employees), and other materials were most effective to generate income, to enroll new subscribers, and to retain existing subscribers.

13

45.     The trade secrets include the analytical results of so-called "A/B Testing," a tool that permits web site operators to assess – literally down to the level of a deliberately misplaced comma in two different versions of the same paragraph of text or two nearly identical photographs – which variant of a particular website feature drove the highest level of customer click-through and – ultimately – customer site registration.

46.     Using the data it created, which cannot be derived from any public-facing material on the websites themselves, Bellesa could determine which digital marketing plans worked best and which did not. That confidential information allowed Bellesa to focus on features and products that drove increased revenue and enrollment, while downplaying features and products that did not drive revenue.

47.     A rival such as LHG with access to the Evaluation Materials could gain a competitive advantage by avoiding its own expensive, time-consuming experimental, trial and error process of developing content. LHG  selectively emulated those features and offerings the Evaluation Material demonstrated provided the best economic return.

48.     The VDR index identifies the Evaluation Materials that Bellesa made available to LH TOPCO. *See Exhibit 3 attached hereto and incorporated herein by reference.* LH TOPCO indisputably accessed Bellesa's trade secret analytical data, as reflected in contemporaneous records generated by the VDR management software.

49.     Bellesa provided LH TOPCO detailed confidential and trade secret marketing plans that: (a) dissected the immediate competitive implications of the

14

foregoing statistical analyses and performance metrics, (b) suggested future developmental projects, and (c) transformed the data into concrete future business and conceptual plans. Bellesa used its confidential data to plan entire digital marketing campaigns that it concluded would increase its revenue more quickly.

50.    After LH TOPCO accessed the Evaluation Materials, LHG engaged in an escalating pattern of replicating Bellesa's marketing materials. The turnaround in copying between Bellesa's original postings and LHG's copies compressed from approximately nine months in 2023 to as little as five days in 2026. Bellesa first discovered LH USA's activities on or about March 22, 2024.

51.    The Evaluation Material disclosed to LH TOPCO via the VDR, and LH TOPCO then disclosed to LHG, included the following (non-exhaustive) list of trade secret materials:

(a)    **"Trade Secret 1"** (**"TS-1"**): Bellesa Boutique Marketing Analytics Dashboard (traffic, conversion, revenue per channel)

(b)    **TS-2:** Marketing Comms playbook — the full editorial / content / influencer strategy

(c)    **TS-3:** Bellesa Brand Strategy and Brand Language style guide

(d)    **TS-4:** Customer Database and CRM metrics, including Customer Feedback datasets

(e)    **TS-5:** Cohort Analysis & Dollar Revenue Retention (FY19–YTD 2022)

(f)    **TS-6:** Category & Product Revenue Breakdown

(g)    **TS-7:** Customer Care data and CSAT metrics

15

(h)    **TS-8:** Competitive Overview (Bellesa's positioning vs. LHG and other industry players)

(i)    **TS-9:** Bellesa Boutique Teaser Presentation (66+ MB, full investor deck)

(j)    **TS-10:** Bellesa's Roadmap to IPO

(k)    **TS-11:** Financial Statements, P&L, capitalization structure, and FY22 budget

### Defendants' Worldwide Exploitation

52.    LHG maintains a substantial and continuous presence in the United States, including a U.S. office in Georgia, and U.S.-based teams of "sexual wellness and e-commerce experts."

53.    LHG publicly represents that it operates warehouse and fulfillment operations in the United States and ships products directly to U.S. consumers.

54.    LHG's websites and online content—including "About Us" and related webpages—are developed, maintained, and disseminated in part through U.S.-based infrastructure and personnel.

55.    LHG uses those U.S.-directed web properties to market its products globally and to drive international sales.

56.    LHG used and incorporated those materials in developing LHG's website content, including customer-facing educational and marketing text.

57.    LHG used Bellesa's copyrighted material across multiple foreign brands, including without limitation, Womanizer (German), We-vibe (Canadian), and Lovehoney (British).

58.    LHG engaged in acts of use, disclosure, and exploitation of those trade secrets in the United States, including developing website content through U.S.-based personnel, hosting, maintaining, or deploying website materials through U.S.-connected systems, and promoting and marketing the content to U.S. consumers.

59.    These U.S.-based acts constitute "use" of trade secrets, including "marketing goods that embody the trade secret" and "soliciting customers through the use of information that is a trade secret."

60.    LHG further marketed and promoted their offerings—incorporating the misappropriated content—through U.S.-facing digital channels and customer engagement tools.

61.    These domestic acts were not incidental, but part of a coordinated global strategy relying on Bellesa's misappropriated materials.

62.    LHG deployed the same or substantially similar web content worldwide, including localized versions accessible in multiple jurisdictions.

63.    That content, derived from Bellesa's trade secrets and copyrighted works, was used by LHG to attract and convert customers globally, support international e-commerce sales, and establish brand positioning across markets.

64.    As a result, LHG and LH TOPCO generated substantial revenues from sales outside the United States that were directly enabled by Evaluation Materials misappropriated in the U.S.

65.    LHG has blatantly copied dozens of digital marketing programs developed by Bellesa. *See Exhibit 4 attached hereto and incorporated herein by reference.*

17

66.     LHG launched a near-identical copy of Bellesa's Taylor Toy Giveaway influencer campaign — the same creator from Bellesa's roster, the same campaign mechanic, the same email subject-line construction, and the same email-3 "mystery toy reveal" architecture. The Taylor funnel is among the strongest single-campaign records. The degree and speed of the replication are consistent with the use of the nonpublic Evaluation Materials rather than independent development.

67.     As shown in Exhibit 4, LHG continued to copy the look, feel, images, and text from Bellesa's digital marketing campaigns.

68.     The Marcus Territory campaign demonstrates LHG's complete, end-to-end copying of an influencer marketing funnel previously executed by Bellesa's affiliated brand Closet (closetshop.co) — the precise architecture of which is the same architecture disclosed to LHG in the 2022 VDR.

69.     Beginning in mid-2024 and continuing through the present, LHG reproduced Bellesa's organic social media output — individual posts, graphics, Instagram reels, and platform-native creative — on a widespread basis.

70.     Ten representative examples of copied posts include:

(a)     January 29, 2026 — Womanizer reel "Spin the Bottle" (10 days after Bellesa original)

(b)     January 31, 2026 — Lovehoney post "Wetting the Bed"

(c)     February 4, 2026 — Womanizer graphic "Fists Opening"

(d)     February 5, 2026 — Lovehoney post "iOS Update" (5 days after Bellesa original)

18

(e)     February 9, 2026 — Lovehoney post "Snowed In" (14 days after

Bellesa original)

(f)     February 13, 2026 — Lovehoney post "Girls Who Use" (21 days

after Bellesa original)

(g)     February 19, 2026 — Lovehoney post "Politely Say" (8 days after

Bellesa original)

(h)     February 20, 2026 — Lovehoney post "Moaning Stimulates" (10

days after Bellesa original)

(i)     March 13, 2026 — Lovehoney post "Look at Someone's Lips" (21

days after Bellesa original)

(j)     March 13, 2026 — Womanizer post "Women Are So Hard to Please"

(10 days after Bellesa original)

71.     A turnaround of five to ten days for daily organic social content is not consistent with coincidence or passive observation. It supports a reasonable inference that LHG monitors Bellesa's creative output and copies  it across LHG's brand portfolio on a recurring basis.

72.     LHG did not just concentrate on a single account. It distributed digital content copied from Bellesa across LHG's portfolio of operating brands — @lovehoneyofficial, @womanizerglobal, and @wevibe. On at least one occasion (We-Vibe's "Oops! You got us!" post, Exhibit 63), an LHG-controlled account admitted copying Bellesa.

73.     A subset of LHG posts identifies Bellesa as the source. A material portion of the copied posts originated on private, zero-follower Bellesa owned accounts used solely as a drafting platform. Bellesa's team drafts posts there,

screenshots them, and reposts them to @Bellesaco on Instagram. Because the source accounts are private and have no public reach, the only public source from which LHG could have encountered that content is @Bellesaco's Instagram feed.

74. Bellesa creates copyrighted scripts, captions, graphics, campaign copy, briefs, and related creative materials in Canada and provides those materials to influencers under a limited authorization to post or use them solely for Bellesa campaigns. Bellesa does not authorize influencers to assign, sublicense, adapt, repost, or provide Bellesa-created materials to LHG, Lovehoney, Womanizer, We-Vibe, or any other third party. Bellesa owns the copyright in all such works, both textual and graphical.

75. LHG's copying began with the highest-cost, highest-investment marketing assets, *i.e.,* influencer programs and paid social ads, a sequence consistent with the use of ROI data disclosed in the VDR rather than random imitation. LHG's copying now spans the full marketing surface area.

76. The earliest copying started following LH TOPCO's exhaustive review of the Project Bishop VDR. But Bellesa did not discover the copying or become aware of the improper use of the Evaluation Material until late 2023 or early 2024. The second wave of copying (February–May 2024) is closely contemporaneous with the renewed Project Bloom engagement in January–April 2024. Both waves of accelerated infringement trace to periods in which LHG was either initially ingesting Bellesa's Evaluation Material or actively re-engaging with Bellesa under a confidentiality umbrella.

77. The facts alleged above—LH TOPCO's access to the nonpublic Evaluation Materials, its below-market offer, and the subsequent systematic copying—support a

reasonable inference that LH TOPCO used the diligence process to obtain competitive information it could not have obtained through ordinary competition.

78.    In 2022, LH TOPCO tendered an offer materially below subsequent commercially reasonable offers received by Bellesa. Bellesa rejected the offer. Less than two years later, Bellesa received an offer valued at approximately 700% higher than LH TOPCO's 2022 offer. That disparity supports the inference that LH TOPCO's 2022 offer did not reflect Bellesa's market value.

79.    LH TOPCO and LHG's coordinated activity was systematic, spanning every layer of Bellesa's proprietary marketing strategies and engines.

80.    The result confused Bellesa's customers and directed them to LHG controlled websites. A consumer who had previously been exposed to Bellesa's influencer campaigns received messages from both Bellesa and LHG that were, to a casual reader, indistinguishable, *e.g.*, identical subject-line structures ("[Name] Toy Giveaway!" / "Here's what you won…"), identical email aesthetics (pink backgrounds, similar layouts), and identical offer mechanics.

81.    Implementing an innovative marketing campaign is an expensive process. By learning precisely the confidential *results* of a campaign through its access to the Evaluation Materials, LH TOPCO and LHG could confidently abandon their own campaigns and emulate the more successful Bellesa campaigns and their content. This objective, confidential data is a highly valuable set of statistics that permitted LHG to make competitive decisions that could not be made by simply reviewing the Bellesa website.

82.    With access under the NDAs to Bellesa's confidential underlying data about the success rates of digital marketing plans, LHG avoided the slow

21

and expensive process of developing its own marketing campaigns. LHG avoided the slow and expensive process of developing and testing its own campaigns and instead reproduced the Bellesa campaigns and content that Bellesa's confidential analytics had identified as most successful. In short, the Defendants used the confidential performance data to determine what to copy, and then copied Bellesa's original expression.

83.    LHG's email marketing adopted structural and tonal elements from Bellesa's campaigns. LHG copied Bellesa's personalized "(1) message from [Name]" subject lines designed to mimic personal messages (Bellesa: "(1) message from Katie"; Lovehoney: "(1) NEW Message from Lovehoney" / "(1) New Message from Santa"). Both used urgency-driven mystery-deal formats. Both used "Can you keep a secret?" teaser framing. The email aesthetic—pink backgrounds, similar typography, similar product photography styling—was designed to evoke the same brand experience, all as analyzed in Bellesa's data analytics and cultivated in its marketing plans.

84.    LHG copied both (a) Bellesa's confidential marketing strategies and (b) public-facing content based on its prior access to the Evaluation Material showing the financial effectiveness of each strategy.

85.    Bellesa built its growth engine in significant part through a proprietary influencer ambassador program. LHG, which relied on Bellesa's confidential data in the Evaluation Material in doing so, subsequently launched "The Hive"—its own ambassador program using the Branbassador platform, with nearly identical value propositions and structurally identical onboarding

22

mechanics, targeting the same sex-positive, body-positive creator demographic that Bellesa had cultivated. *Exhibit 4, showing comparisons.*

86.    The replication was granular, systematic, and followed LHG's access to Bellesa's confidential Evaluation Material. Bellesa's confidential data provided LHG with a way to shortcut, if not completely eliminate, the development of its own content and to implement that content with assurances of commercial efficacy without enduring the trial and error in which Bellesa invested.

87.    Defendants' use of Bellesa's trade secrets and copyrighted materials was a substantial factor in attracting customers, enhancing user experience, and increasing conversion and sales globally.

88.    The resulting profits constitute unjust enrichment recoverable under the DTSA, which allows recovery of actual loss, and "any unjust enrichment … not addressed in computing damages for actual loss."

89.    Bellesa seeks all profits, unjust enrichment, reasonable royalties, avoided development value, and other damages legally attributable to Defendants' misuse of Bellesa's Evaluation Materials and copyrighted works, subject to proof and applicable apportionment rules.

90.    Defendants' misconduct was willful and malicious, including knowing use and continued exploitation of Bellesa's proprietary Evaluation Materials.

91.    Under the DTSA, such conduct supports an award of exemplary (punitive) damages of up to twice the compensatory award.

## COUNT I

23

## BREACH OF NDAs

92.     Bellesa incorporates by reference the allegations of paragraphs 1-91 as if set forth verbatim herein.

93.     The NDAs are enforceable contracts between Bellesa and LH TOPCO.

94.     LH TOPCO breached the NDAs by disclosing the Evaluation Material for competitive purposes to and through its subsidiaries, all of which Paragraph 4 of the NDAs prohibited. None of LH TOPCO's subsidiaries had any need to access or review the Evaluation Materials provided under the NDA.

95.     Under the NDAs, LH TOPCO agreed that Bellesa's Evaluation Material would be kept confidential and used solely for the limited purpose of evaluating a potential transaction with Bellesa.

96.     The NDAs prohibited LH TOPCO from using the Evaluation Material for any competitive purpose and required LH TOPCO to limit disclosure of the Evaluation Material to defined representatives who needed access for transaction evaluation and who were bound to comply with the NDAs' restrictions. The NDAs permitted disclosure only to Representatives who needed access for transaction evaluation and who were bound to comply with the NDAs. They did not permit LH TOPCO to disclose Evaluation Material to operating-company personnel for competitive marketing purposes or to allow affiliated entities to use the Evaluation Material to develop, accelerate, or optimize competing campaigns.

97.     In reliance on those agreements, Bellesa disclosed highly confidential  Evaluation Material to LH TOPCO during the parties' diligence

24

process, including nonpublic marketing analytics, conversion and cohort data, funnel architecture, influencer performance information, testing results, campaign strategies, financial materials, and related internal business records.

98. LH TOPCO breached the NDAs by using Bellesa's Evaluation Material for purposes other than evaluating a transaction, including by using it, directly or through LHG, to inform, accelerate, and optimize competing marketing campaigns.

99. LH TOPCO also breached the NDAs by disclosing Bellesa's Evaluation Material to affiliated operating entities and permitting or directing those entities to use the information for competitive purposes unrelated to any transaction evaluation.

100. The use and disclosure of Bellesa's Evaluation Material in this manner violated LH TOPCO's contractual obligations of confidentiality and restricted use.

101. As a direct and proximate result of LH TOPCO's breaches, Bellesa has suffered and continues to suffer damages, including lost profits, loss of competitive advantage, increased marketing costs, and other injury in an amount to be proven at trial.

102. Bellesa is entitled to all contractual and equitable relief available for LH TOPCO's breaches, including injunctive relief.

## COUNT II

### DIRECT COPYRIGHT INFRINGEMENT (17 U.S.C. § 501 *et seq.*)

103. Bellesa incorporates by reference the allegations of paragraphs 1-102 as if set forth verbatim herein.

104. Bellesa owns valid copyrights, enforceable under the Copyright Act as foreign works, in original marketing expression created and first published outside the United States, including without limitation:

(a) email copy, including subject lines, preview text, and multi-email campaign sequences;

(b) social-media captions, scripts, and post text;

(c) influencer campaign briefs, promotional scripts, and related written creative;

(d) original graphics, layouts, visual designs, and other creative assets used in email, social, and influencer campaigns; and

(e) original compilations, selections, and arrangements of campaign content reflected in the exhibits and copyright schedule attached to this Complaint.

*Exhibit 4, schedule of Canadian copyrights infringed by LHG.*

105. These copyrighted works were created by or for Bellesa in Canada and first published outside the United States. The registration prerequisite in 17 U.S.C. § 411(a) does not apply to the foreign works asserted here.

106. Defendants had access to Bellesa's copyrighted works, including through Bellesa's public-facing websites.

107. Defendants copied original, protectable expression from Bellesa's copyrighted works, including without limitation near-verbatim text, repeated subject-line formulations, duplicated preview text, materially similar campaign scripts, substantially similar layouts, and other distinctive creative choices reflected in the comparison exhibits attached hereto.

108. Defendants copied more than unprotectable ideas, themes, or general marketing concepts. Defendants copied Bellesa's original expression of those ideas, including wording, sequencing, structure, arrangement, and, in certain instances, did so down to the level of copying the same nonstandard phrasing or typographical errors.

109. This copyright claim is based on Defendants' copying of protected creative expression. It is distinct from Bellesa's trade-secret claims, which concern Defendants' misuse of nonpublic business information, internal performance data, testing results, and confidential marketing know-how.

110. The substantial similarities between Bellesa's works and the LHG works demonstrate copying.

111. In addition. Bellesa's internal corporate documents, including, without limitation, its strategic business analyses, are original works of authorship under the Copyright Act. To advance and accelerate the misappropriation of Bellesa's trade secrets, Defendants made and circulated both electronic and paper copies of Bellesa's works.

112. LHG's acts constitute willful infringement.

113. Bellesa has been damaged by Defendants' willful infringement.

114. Defendants also infringed Bellesa's copyrighted works by reproducing, adapting, and distributing such copyrighted content in their website materials.

115. The Copyright Act permits recovery for infringement where a domestic act of infringement occurred in the United States, and that act enabled or is directly linked to foreign infringement.

27

116.    Defendants committed domestic acts of infringement, including copying and preparing derivative works within the United States, publishing or distributing infringing content through U.S.-based systems, and deploying content for use in U.S.-facing websites.

117.    These domestic acts served as the predicate acts that enabled Defendants' subsequent global dissemination and exploitation of the same content.

118.    The foreign reproduction, distribution, and display of that content were directly linked to and flowed from Defendants' U.S.-based infringement.

119.    Bellesa is entitled to recover damages arising from Defendants' worldwide infringement under the predicate-act doctrine.

## COUNT III

### CONTRIBUTORY AND VICARIOUS COPYRIGHT INFRINGEMENT
### (In the Alternative to Count II)

120.    Bellesa incorporates by reference the allegations of paragraphs 1-119 as if set forth verbatim herein.

121.    In the alternative, to the extent Defendants contend that any accused use was authorized by influencers, any such authorization was ineffective because Bellesa granted influencers only a limited right to use Bellesa-created materials for Bellesa campaigns. Bellesa did not authorize influencers to assign, sublicense, adapt, repost, or provide Bellesa-owned materials to Defendants or Defendants' brands. Defendants knew or should have known that any such use exceeded the scope of the influencers' limited authorization and materially contributed to, induced, or profited from that unauthorized use.

122. Defendants had actual or constructive knowledge of the ongoing direct infringement.

123. Defendants actively helped the influencers commit direct infringement by providing the site, tools, materials, or means that substantially made the direct infringement possible.

124. Defendants led, encouraged, or promoted the influencers to infringe Bellesa's copyrighted works.

125. Defendants are liable for vicarious copyright infringement because they had the legal right and practical power to stop the direct infringement from happening but chose not to because they made significant money from the direct infringement.

126. The influencers' use of Bellesa's copyrighted works outside the scope of the authority granted by Bellesa constitutes direct copyright infringement.

127. Defendants possess the legal authority and practical ability to police, stop, or limit the direct infringement.

128. Defendants profited from the infringement.

## COUNT IV

### MISAPPROPRIATION OF TRADE SECRETS
(Defend Trade Secrets Act, 18 U.S.C. § 1836)

129. Bellesa incorporates by reference the allegations of paragraphs 1-128 as if set forth verbatim herein.

130. Bellesa developed, through substantial time, expense, testing, and experience, a body of confidential commercial information and marketing know-

how that derives independent economic value from not being generally known and not being readily ascertainable by proper means.

131. Bellesa took reasonable measures to protect the secrecy of that information, including restricting internal access, using secure systems, limiting dissemination, and requiring confidentiality agreements, including the NDAs with LH TOPCO.

132. The trade secrets at issue consist of nonpublic business information and performance know-how, including without limitation the following information:

(a) ("**TS-1**"): Bellesa Boutique Marketing Analytics Dashboard (traffic, conversion, revenue per channel)

(b) **TS-2:** Marketing Comms playbook — the full editorial / content / influencer strategy

(c) **TS-3:** Bellesa Brand Strategy and Brand Language style guide

(d) **TS-4:** Customer Database and CRM metrics, including Customer Feedback datasets

(e) **TS-5:** Cohort Analysis & Dollar Revenue Retention (FY19–YTD 2022)

(f) **TS-6:** Category & Product Revenue Breakdown

(g) **TS-7:** Customer Care data and CSAT metrics

(h) **TS-8:** Competitive Overview (Bellesa's positioning vs. LHG and other industry players)

(i) **TS-9:** Bellesa Boutique Teaser Presentation (66+ MB, full investor deck)

(j)    **TS-10:** Bellesa's Roadmap to IPO

(k)    **TS-11:** Financial Statements, P&L, capitalization structure, and

FY22 budget

133.    LH TOPCO acquired Bellesa's trade secrets during the parties'
confidential diligence process, subject to the NDAs and under circumstances
giving rise to a duty to maintain their secrecy and to use them solely for the
limited purpose of evaluating a potential transaction.

134.    Instead of honoring those obligations, LH TOPCO disclosed
Bellesa's trade secrets to affiliated operating entities and permitted or directed
their use for competitive purposes.

135.    Defendants used Bellesa's trade secrets, without consent, to
accelerate, refine, and deploy competing marketing campaigns, thereby avoiding
the time, cost, and risk of developing and testing their own strategies
independently.

136.    Defendants knew or had reason to know that Bellesa's trade secrets
were acquired under a duty of confidentiality and through improper means when
used for purposes other than evaluating a transaction.

137.    Bellesa's trade secrets are related to products and services used in,
or intended for use in, interstate and foreign commerce.

138.    The DTSA applies extraterritorially where "an act in furtherance of
the offense was committed in the United States."

139.    Defendants' U.S.-based acts of developing, deploying, and
promoting web content embodying Bellesa's trade secrets constitute such acts in
furtherance.

31

140. Once an act in furtherance occurs in the United States, Bellesa may recover damages caused by the misappropriation worldwide, "wherever in the world the rest of the underlying conduct occurred."

141. Because Defendants committed acts in furtherance of the misappropriation in the United States, Bellesa seeks all damages and unjust enrichment caused by Defendants' domestic and foreign exploitation of Bellesa's trade secrets to the extent recoverable under the DTSA.

142. As a direct and proximate result of Defendants' misappropriation, Bellesa has suffered and continues to suffer damages in an amount to be proven at trial and is entitled to all remedies available under the Defend Trade Secrets Act, including injunctive relief, damages, unjust enrichment, exemplary damages as permitted by law, and attorneys' fees.

## COUNT V

## NEW YORK COMMON-LAW TRADE SECRET MISAPPROPRIATION

143. Bellesa incorporates by reference the allegations of paragraphs 1 through 142 as if set forth verbatim herein.

144. The elements of New York common-law trade secret misappropriation mirror those under the DTSA.

145. Bellesa possessed trade secrets consisting of valuable, nonpublic business information and marketing know-how, including the categories of information identified above, such as campaign-performance analytics, customer-cohort and attribution data, influencer scoring and results, funnel architecture, testing protocols and results, and cost and budget information.

146. Those trade secrets were not generally known, were not readily ascertainable by proper means, and derived independent economic value from their secrecy.

147. Bellesa took reasonable measures to protect the confidentiality of those trade secrets, including restricting access, maintaining secure systems, limiting dissemination, and requiring confidentiality agreements, including the NDAs with LH TOPCO.

148. Defendants acquired Bellesa's trade secrets through a confidential diligence process and under circumstances giving rise to duties of confidence and limitations on use.

149. Defendants then disclosed, used, and exploited Bellesa's trade secrets without authorization and for competitive purposes, including to accelerate, refine, and deploy competing marketing campaigns while avoiding the cost, delay, and risk of independent development.

150. Defendants knew or had reason to know that Bellesa's trade secrets were confidential and had been obtained subject to duties of non-disclosure and restricted use.

151. Defendants' conduct constitutes misappropriation of trade secrets under New York common law.

152. As a direct and proximate result of Defendants' misappropriation, Bellesa has suffered and continues to suffer damages in an amount to be proven at trial and is entitled to recover all relief available under New York law, including injunctive relief, compensatory damages, disgorgement, and other appropriate equitable relief.

33

## COUNT VI

## UNFAIR COMPETITION (NEW YORK COMMON LAW)

153.    Bellesa incorporates by reference the allegations of paragraphs 1 through 152 as if set forth verbatim herein.

154.    Through years of investment, experimentation, creative development, testing, and market engagement, Bellesa developed valuable marketing assets, goodwill, and commercial advantage, including the confidential Evaluation Material, the Bellesa Playbook, original campaign structures, and associated creative and promotional strategies.

155.    Defendants, acting in bad faith, misappropriated the fruits of Bellesa's labor, skill, expenditures, and commercial efforts by obtaining access to Bellesa's confidential Evaluation Material through the parties' NDA-governed diligence process and then using that information to compete against Bellesa.

156.    Defendants' conduct was not ordinary competition. Defendants used confidential information entrusted to LH TOPCO for the limited purpose of evaluating a potential transaction and instead exploited that information to accelerate, refine, and deploy competing campaigns, to copy Bellesa's successful marketing structures and creative approaches, and to neutralize Bellesa's competitive advantage.

157.    Defendants further acted in bad faith by abusing a confidential relationship, breaching contractual restrictions on use and disclosure, and using information acquired through that relationship for commercial gain at Bellesa's expense.

34

158. Defendants thereby reaped where they had not sown and appropriated for themselves the value of Bellesa's investments, labor, skill, and market development without bearing the cost, time, or risk of independent creation and testing.

159. Defendants' conduct also caused marketplace confusion and harm to Bellesa's goodwill by deploying campaigns, messaging structures, and creative formats that closely tracked Bellesa's own marketing output and could cause consumers to associate Defendants' campaigns with Bellesa or to view Defendants as the source of ideas and campaign formats developed by Bellesa.

160. As a direct and proximate result of Defendants' unfair competition, Bellesa has suffered and continues to suffer damages, including loss of competitive advantage, diversion of commercial opportunities, harm to goodwill, increased marketing costs, and other injury in an amount to be proven at trial.

161. Bellesa is entitled to all relief available under New York law, including injunctive relief, compensatory damages, disgorgement, and such other legal and equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A. Judgment against the applicable Defendants on the appropriate counts and jointly and severally to the extent permitted by law;

B. Damages and other monetary relief in an amount to be proven at trial, presently believed to exceed $100 million, including lost profits, Defendants' unjust enrichment and attributable profits, disgorgement, reasonable royalty/head-start damages, corrective advertising and brand-

repair costs, enterprise-value impairment, and exemplary damages as permitted by law, all subject to proof and applicable apportionment rules;

C.  Injunctive and equitable relief;

D.  Attorneys' fees, pre- and post-judgment interest, and costs; and

E.  All other just and proper relief.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Bellesa demands a trial by jury on all issues so triable.

Dated: July 10, 2026          Respectfully submitted,

FISHERBROYLES, LLP


*/s/ John Oh*
FisherBroyles, LLP
445 Park Avenue, Ninth Floor
New York, NY 10022
Mailing Address:
55 Union Place, #336
Summit, NJ 07901
646.239.9204
John.oh@fisherbroyles.com

Stephen J. Driscoll                    Alastair J. Warr
One Liberty Place                      FisherBroyles, LLP
1650 Market Street                     203 N. LaSalle Street, Suite 2100
Philadelphia, PA 19103                 Chicago, IL 60601
Mobile: 610.517.0016                   Tel. 317.407.5260
stephen.driscoll@fisherbroyles.com     Alastair.warr@fisherbroyles.com
*Pro hac vice to be filed*             *Pro hac vice to be filed*